BOUTALL, Judge.
This is a case involving the validity of five life insurance policies of New Jersey Life Insurance Company insuring the life of Lawrence A. Comiskey, in which Henri Petetin, Inc. and H. H. Hansell, Inc. were named beneficiaries. The policies are described as follows :
NUMBER AMOUNT POLICY DATE BENEFICIARY
108711 $ 25,000 Jan. 28,1969 HANSELL, INC.
108712 $ 25,000 Jan. 28,1969 PETETIN, INC.
109184 $ 25,000 March 20', 1969 PETETIN, INC.
109358 $ 25,000 April 1,1969 PETETIN, INC.
109526 $100,000 April 10,1969 PETETIN, INC.
The original petition was brought by the insurer to declare the first two policies, No. 108711 and No. 108712 void because of failure of the insured, Lawrence A. Comis-key, to disclose in his application that he had been hospitalized on October 3, 1967 for several days, that death had occurred within the contestable period of the policies, that the failure to answer the medical questions truthfully was material to the risk and was a knowing and false misrepresentation by the insured. After various pleadings filed by the parties, the validity of all five policies were finally put at issue. Additionally, the policy beneficiaries instituted third party pleadings against the insurance agent, Morris Shapiro, and the examining physician for the insurer, Dr. Nicholas Pitha. After a lengthy trial, the trial judge granted judgment in favor of the beneficiaries on the first two policies, No. 108711 and No. 108712, but granted judgment in favor of the insurer on the last three policies, 109184, 109358 and 109526, declaring them to have never been put into effect. The third party demands against the insurance agent and the examining physician were dismissed. From this judgment the insurer and the beneficiaries have each appealed. We affirm the judgment of the trial court.
The general facts are these. Morris Shapiro, a local insurance broker and agent had sold some life insurance to Lawrence A. Comiskey in the face amount of $100,000 in the year 1966. The insurance was provided by two companies, Pacific Mutual Insurance Company and Presidential Life Insurance Company. These policies, as well as other policies on the life of Lawrence A. Comiskey, had been sold with an increased or rated premium indicating Lawrence A. Comiskey was a substandard risk. It was known that this insured had a mild case of Diabetes Meli-tus, and for that reason, the policies issued to him previously had premiums that were not standard. Testimony of Morris Shapiro.) Shapiro continued to attempt to sell Comiskey life insurance and in this regard, made a survey of all policies held by Com-iskey in 1968. As a result of this examination, he convinced Comiskey that he *728 could place insurance providing the same coverage for lesser premiums, and after consultation with New Jersey Life Insurance Company of Newark, New Jersey, with whom he placed insurance, he obtained on December 12, 1968 an application, Part I, from Comiskey on a form provided by New Jersey Life (See Exhibit H P-11) and the next day, the applicant was sent to and given a physical examination by Dr. Nicholas Pitha for New Jersey Life. Shapiro forwarded the medical examination and the application to New Jersey Life. As a result thereof, a pre-insurance investigation of the insured was undertaken and the attending physician’s statement, and EKG, chest x-ray and urine specimen were obtained. (See Exhibit H P-6 Quote Sheet). Upon the insurer’s satisfaction of the applicant being an insurable risk, two policies were issued each in the amount of $25,000 graded whole life, dated January 28, 1969 and numbered 108711 and 108712. The policies were delivered and the premiums were paid.
Shapiro continued to confer and negotiate with Comiskey and decided that there was a possibility he could sell to Comiskey and his wife two policies of $25,000 joint whole life, insuring the life of each of them and requested New Jersey Life to forward policies to him for delivery to the prospective customers for examination. Of these two policies we are only concerned with the one on Mr. Comiskey’s life, that is No. 109184. At about the same time, Shapiro, because of the interest indicated by Comiskey in obtaining more insurance, felt that he could also sell an additional $25,000 policy, and requested New Jersey Life to forward for examination another graded whole life policy in the amount of $25,000 and, on April 1, 1969, New Jersey Life forwarded such a policy numbered 109358. We will discuss the two policies later.
During the same period of time, Shapiro had convinced Comiskey that he should increase his life insurance coverage because of his businesses, and advised Comiskey that he could obtain as much as $100,000 coverage at a reasonable premium of about $7,000 per year. Accordingly, he opened negotiations with Globe Life Insurance Company to provide such coverage and, on March 1, 1969, he took from Comiskey payment to satisfy the hoped for premium of $7,000, represented by a check on the account of Henri Petetin, Inc. in the amount of $1,000 and a promissory note in the sum of $6,000, which was to be financed through the Bank of Louisiana. Shapiro sent to Globe Life a payment of $300 towards the policy, however Globe Life declined to issue the coverage for the premiums indicated. Shapiro requested that the whole life coverage be placed with New Jersey Life, and that company decided to accept the risk. Accordingly, a policy was issued by New Jersey Life, Policy No. 109526, but the policy was a graded whole life policy and not a regular whole life policy. When Shapiro received that policy for transmission to the client, he noted the error in the policy and returned it the next day pointing out the error and requested the issuance of a whole life policy. Within the next several days, and before the company issued another policy, Lawrence A. Comiskey died on April 29, 1969. The company was notified almost immediately of the death of the insured and it refused to issue another policy.
After the death of Mr. Comiskey, because of the questionable status of the last three policies, and because the time of death was within the contestable limitations of the original two policies, the insurance company launched an investigation into the prior health of Mr. Comiskey. As a result of this investigation it determined that Mr. Comiskey had been hospitalized on October 3, 1967, and this fact had not been reported in the application. Because it determined that this fact was vital to the determination of the risk it wished to undertake, and because it felt that had it known of such a disclosure the risk would not have been undertaken, the company refused payment of all of the policies. Additionally, the company contends that *729 policy No. 109184 and policy No. 109358 were never issued or delivered by it as effective policies and that they were never accepted or agreed to by the insured. The last policy, No. 109526, had been issued in error, but had never been delivered to the insured nor had it been accepted by him.
After his consideration of the issues the trial judge rendered judgment as to each individual policy and gave detailed and cogent reasons for his conclusions. He ruled that policies No. 108711 and No. 108712 were in full force and effect. He found that although the medical statement of the insured did not mention the hospitalization, that this omission was not material to the risk, that the omission was unintentional and there was no intent to deceive. He found that policy No. 109184 was left for study of the insured, and was not paid for or accepted by the insured. There was no evidence that policy No. 109358 had ever been delivered. As to policy No. 109526, he found that there was no actual delivery of the policy in accordance with its terms and that it was not in effect at the death of the insured.
Since the primary defense to all of these policies is the failure to disclose material representations we shall first consider that issue. We refer to the provisions of LSA-R.S. 22:619 which states as follows:
“§ 619. Warranties and misrepresentations in negotiation; applications
“A. Except as provided in Sub-section B of this Section and R.S. 22:692, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
“B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer. Amended and reenacted Acts. 1958, No. 125.”
The pertinent facts relating to this issue are as follows. After the agent Shapiro had convinced Comiskey that he could obtain insurance from New Jersey Life at a more reasonable rate, on December 12, 1968, Comiskey filled out part I of the application forms provided by New Jersey Life to obtain the insurance. The next day he reported to the examining physician of New Jersey Life, Dr. Pitha, for a physical examination and at that time filled in part II of his application which related to his medical history. One of the questions was “Had he ever been treated by any physician in respect to treatment or observation in any hospital or institution?” In response to this question, Comiskey disclosed two earlier hospitalizations in 1955 for a gastrectomy and in 1925 [1] for a he-morrhoidectomy, but did not disclose that he had also been hospitalized at Touro Infirmary from October 3rd to 6th, 1967.
This last hospitalization was occasioned by the fact that Comiskey had diarrhea for several days previously, that he had severe dehydration, fever of 103° and talking out of his head. The attending physician was Dr. Louis Levy who was Comiskey’s family physician. After a number of tests were given, it was determined that Comis-key was suffering from “viral gastroenteritis”. Comiskey was treated on this basis and within three days was discharged from the hospital, and upon follow up by the physician was declared cured and as having no ill effects from the occurrence. *730 The hospital record disclosed that one of Dr. Levy’s diagnoses on admission was “Prob ASHD” (meaning probable arterio-sclerotic heart disease), that Dr. Levy had requested a neurological consultation, a skull x-ray and an electroencephalogram. The results of these tests were that the skull x-ray showed some calcification in the region of the internal carotid artery and that the electroencephalogram was “abnormal . . . The cause is not clear but the abnormalities resemble vascular accident or insufficiency.” It should be noted that the insured died of a coronary thrombosis.
The position that the insurance company takes upon this is that while the viral gastroenteritis of itself would normally cause no hesitancy in accepting the applicant, nevertheless the severity of this cáse would have caused grave doubts. Mainly however, there would have been examination of the hospital record and discovery of the possible diagnosis and the results of the tests set out above, and this would have certainly caused it to deny coverage. To support this, the company has produced expert testimony both of a medical and actuarial nature to prove that Mr. Comiskey was indeed a poor risk, and that under these circumstances, their medical examiners would have recommended against coverage. To offset this, the beneficiaries have introduced medical evidence to show that there was in fact nothing seriously wrong with Mr. Comiskey at that time, and that his medical history, both before and after, was such that it was not even suspected by his doctors that Mr. Comiskey had any serious medical problems, let alone Mr. Comiskey himself. A comparison of the conflicting evidence presented led the trial judge to believe that the hospitalization and the test results were not a material factor to the risk involved, and we find in the record evidence to substantiate his findings.
The testimony of Dr. Levy makes it clear that when one of his patients presents the symptomology of Comiskey that he usually had a neurological examination done for the best interest of the patient so as to negate the possibility of serious neurological disorders. The results of these and other tests administered to the patient convinced him that the only problem the patient had was simply the results of dehydration in connection with the gastroenteritis. He was treated for this for two days and discharged and had effected a complete recovery. He concluded that the skull x-rays did not show anything abnormal for a man of these years and in fact was quite normal. The result of the electroencephalogram was a temporary matter due only as a result of the gastroenteritis. His conclusions are fully supported by the testimony of Dr. Donald Richardson who was called in consultation as a specialist in this precise area. He explained that the skull x-ray simply showed what one would normally see in a man sixty-three years old and that the central nervous symptoms exhibited were on the basis of metabolic derangement as a result of the patient’s acute diarrhea. We find it further significant that Dr. Levy had treated this patient for some fourteen years up to the time of his death, and had seen him at fairly frequent intervals because of his diabetes condition. During this period of time the diabetes was kept in check by diet and the patient had never exhibited any symptoms of arteriosclerosis or heart disease. The doctor had routinely checked his condition several times after the hospitalization episode and found him completely within normal limits, the last examination being shortly before his death. It should be remarked at this time that the insurers’ examining physician found nothing wrong with Mr. Comiskey during his examination. The testimony of the doctors shows that they considered the hospitalization and the test administered therein to be of little significance in Mr. Comiskey’s general health picture, and we conclude that Mr. Comiskey himself was of the same opinion.
In passing it may be noted that the medical portion of the application, part II was *731 filled in by the examining physician and signed by Mr. Comiskey. That doctor testified that he would not normally make any insignificant entries in a person’s medical record, and there is a possibility, which perhaps is worthy of consideration under these circumstances, that the examining physician did not believe it necessary to be mentioned. However we note this only in passing and place no reliance upon that aspect.
While insignificant of itself, we also note that Mr. Comiskey applied for and received a life insurance policy with the Mutual Life Insurance Company of New York in the amount of $25,000 twenty days after this hospitalization, and in his application made disclosure of the hospitalization in question. Of course, the actions of MONY bear no relationship to the actions or decisions of New Jersey Life. We point this matter out only for the purpose of demonstrating that Mr. Comiskey was probably aware of the fact that he could obtain insurance with disclosure of that hospitalization. Equally as impressive is the fact that subsequent policies had been delivered to him for inspection, and had he wished to take advantage of the company, or had he been concerned about his health, he could have very easily accepted those policies. Similarly the last policy presented to him, that is No. 109526, for which he was reexamined medically, and for which he had paid the premium could have simply been accepted by him as written with “graded whole life” rather than “whole life” and effected a savings in the premiums initially. Bearing in mind that these policies were designed as replacement policies for insurance already in existence well past the contestable stage, we can find no evidence whatsoever of intent to deceive or make false representations. As the trial judge stated: “It does not seem logical that if the deceased disclosed a diabetic condition and an ulcer, that he would specifically fail to disclose a three day confinement in a hospital.” We find sufficient evidence to support the findings of the trial judge and hold that the insuror has failed to meet its burden of proof required to come within the provisions of R.S. 22:619 subd. B.
We are referred to the case of Gay v. United Benefit Life Insurance Company, 233 La. 226, 96 So.2d 497 (1957) which held that a material false statement in an application will vitiate an insurance policy only if the applicant knew of its incorrectness. We point out that while certainly the applicant here knew that he had been hospitalized, the evidence establishes overwhelmingly that he considered it was only for treatment of the viral gastroenteritis (that is, intestinal flu) and could have no idea, even from his doctors, that he had any vascular accident or insufficiency to cause him concern. We have been referred to a number of cases by both parties to this litigation involving specific alleged material misrepresentations, and without discussing them all, we conclude that the omission in this case does not violate either the statutory or jurisprudential rules.
The only defense urged to the request for payment of policies No. 108711 and 108712 is the omission discussed above. There is no question as to the issuance and delivery of the policies and the premiums had been paid. Accordingly, we conclude that those two policies are valid and payment of' the face amount should be made by the insurer to the respective beneficiaries.
We now turn our consideration to the specific defenses raised in connection with the other policies.
Policy No. 109184 was dated March 20, 1969 and was sent by the New Jersey Life to the agent Shapiro to be presented to Mr. Comiskey for his examination and study. The request for the policy by the agent clearly shows that this policy, together with a similar policy, No. 109186, insuring the life of Mr. Comiskey’s wife, Katherine G. Comiskey, were of a prospective nature and furnished for examination in the hope that sale of these policies could be *732 made. Also in evidence are two receipts for these two policies, one signed by Mr. Comiskey and the other by his wife, reciting that the policy was left on deposit for survey to be returned or paid for. There is no evidence that this policy was accepted by Comiskey or that the premium was paid. We agree with the finding of the trial judge that this policy had never been legally issued or placed into effect.
During this same interval of time, the agent requested New Jersey Life to forward for examination another policy with Petetin, Inc. to be the beneficiary. This is policy No. 109358, which apparently was forwarded to the agent. Exactly what happened to this policy thereafter is unknown because no one is able to account for it or produce a copy of it for evidence in court. However, there is no evidence shown that this policy was ever even delivered to Mr. Comiskey and no evidence of acceptance or payment of premiums thereon. We affirm the finding of the trial judge that this policy had never been in effect.
The last policy for our consideration is policy No. 109526 in the amount of $100,000 dated April 10, 1969. We have recited most of the facts concerning this policy hereinabove. Mr. Comiskey had agreed to accept a whole life policy in this amount and in fact had provided for payment of the premium to the extent of $7,000. We are convinced from the evidence that, had the company sent a whole life policy in accordance with the agent’s instructions, this policy would have been delivered and accepted and the premiums paid within Mr. Comiskey’s lifetime. Unfortunately, the policy sent contained different premium payments, that is, graded whole life instead of ordinary whole life, with the resultant change in cash value, etc., during the life of the policy. The policy was not accepted by Mr. Comiskey, but was returned by the agent who called attention to the discrepancy and requested substitution of a whole life policy. Before a new policy was issued, Mr. Comiskey died.
It is contended by the beneficiaries that all of the ingredients necessary to a contract of insurance were in existence:
1) that there was an agreement between the parties, or a meeting of the minds;
2) there was payment of the premium; and
3) the company intended to issue the policy and indeed had forwarded the policy, only the method of premium payment being erroneously applied.
Because of these factors they urge that the rationale of the case of Coci v. New York Life Insurance Company, 155 La. 1060, 99 So. 871 (1924) is controlling here and the policy was in effect. In that case the court stated as a general rule:
“Where an application is made for a life policy and a sum of money paid to the agent of the insurer to be applied on the first premium if the insurer decides to issue a policy, the contract is complete on the issuance of the policy * *
We distinguish the facts and conditions of the policy in the Coci case from the present case. In Coci all steps necessary to the validity of the policy had been accomplished, and there was only the problem of physical delivery to the insured in good health. That court held that the insured only warranted good health at the time the contract was to become consummated and binding and this did not require an actual physical and personal delivery of the policy. It was held that the completion and mailing of the contract constituted the delivery within the law. In the case at bar, we first note that there was no application made to New Jersey Life for this particular policy. The application that was submitted by the agent was an application directed to Globe Life who refused to issue its policies at the required premium rate. Through the efforts of the agent, the New Jersey Life was persuaded to issue its poli *733 cy, but it did not do so unconditionally. The policy provides that one of the considerations of the policy is the application, and the insurer was not in possession of any application. Accordingly, when the policy was sent out it was transmitted with a policy delivery notice directed to the agent requiring him to have the applicant sign both copies of part I of the application and return the original copy to the home office. No such application was signed but instead the policy was returned because of the error contained therein. This policy further required that it shall not take effect until it has been delivered. There thus was no actual delivery but instead an actual return of the policy. It cannot be argued the simple mailing of the policy constituted delivery because the policy here, unlike Coci, did not constitute the agreement sought to be made by the insured and acceptable to him.
We believe the facts herein to be closer to those pertaining in the case of Pruitt v. Great Southern Life Ins. Co., 202 La. 527, 12 So.2d 261 (1942). The insured there had applied for insurance, had paid the premium and had died after the policy was received by the agent from the home office but before it was actually delivered to him. In that case the policy was forwarded to the agent with certain instructions particularly requiring the policy to have been actually delivered to the insured and accepted by him while he was in good health. The court stated:
“There can be no doubt that the insurance company understood the policy applied for was not to become effective unless and until it was actually delivered to the insured while he was in good health, as well as that it must be accepted by him, for when it transmitted the policy to its soliciting agent for delivery, it specifically instructed him to ascertain the condition of the health of the insured and not to deliver the policy to him if he was or had been in ill health since the date of his application. If such was found to be the case, the agent was instructed to return the policy to the company.
“[5,6] It seems obvious to us that it was the intention of the parties to reserve unto themselves the right to repudiate the contract up until the moment of its consummation.”
The evidence produced herein convinces us that this policy was not consummated by mailing to the agent but that either party had the right to repudiate it up until it was actually delivered to and accepted by the insured. We hold that policy No. 109526 never became effective because of lack of proper delivery and acceptance, and we thus affirm the ruling of the trial judge in this regard.
For the foregoing reasons, we are of the opinion that the findings of the trial judge were correct, and accordingly, we affirm the judgment appealed from. Since both parties have appealed this matter we are of the opinion that each should bear his own appellate costs.
Affirmed.

. We note a variance in these dates in the record.